**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 17-cr-** |
| | : | |
| **v.** | : | **VIOLATION:** |
| | : | |
| **TIMOTHY W. REDMAN,** | : | **18 U.S.C. § 371 (Conspiracy to Commit Offense Against the United States)** |
| | : | |
| **Defendant.** | : | |

Case: 1:17-cr-00102
Assigned To : Judge Lamberth, Royce C.
Assign. Date : 5/31/2017
Description: INFORMATION A

**INFORMATION**

The United States Attorney charges that:

**COUNT ONE**
**(Conspiracy to Commit Offense Against the United States)**

At all relevant times to this Information:

**Introduction**

1. The U.S. Government Accountability Office ("GAO") was an independent, nonpartisan agency of the legislative branch. It investigated how the federal government spends taxpayer dollars. The GAO headquarters was located at 441 G Street, N.W., Washington, D.C.

2. The Office of Public Affairs ("OPA") was a GAO staff office. OPA oversaw the production of several products, managed GAO's digital and social media presence, and coordinated the logistics for television and radio interviews.

3. Defendant Timothy W. Redman worked for OPA at the GAO headquarters. Defendant Redman's official title was "Electronics Technician."

4. Co-Conspirator A was the president of Company A. Company A provided video production, audio/video, and multimedia services for government agencies, including GAO, and private entities.

5. Defendant Redman also worked as a subcontractor for Company A. He provided past performance references for Company A in support of Company A's application to be certified as a participant in the Small Business Administration's 8(A) Business Development Program.

6. Co-Conspirator B was a close family member of Defendant Redman.

**Co-Conspirator B's Mortgage Application**

7. In early July 2012, Co-Conspirator B applied for a $168,000 mortgage. The mortgage company required that Co-Conspirator B be employed as a condition to granting the mortgage.

8. On the application, Co-Conspirator B falsely represented that Company A was Co-Conspirator B's current employer, and that Co-Conspirator B had been employed by Company A for one month. Co-Conspirator B certified that the information in the application was true and complete, and acknowledged that it was a federal crime to knowingly make any false statements on the application.

9. On July 18, 2012, the mortgage company loan originator sent an email to Defendant Redman and Co-Conspirator B with the subject line "what we still need to go to closing." The loan originator explained that, among other things, he needed "verification of employment filled out by [Co-Conspirator B's] new employer." The loan originator further advised that, "We have to go to corporate for an exception to close prior to first paystub."

10. At the time of the email, Defendant Redman knew that Co-Conspirator B was not working for Company A as stated on Co-Conspirator B's mortgage application, and that the mortgage company would not issue the loan if it knew that Co-Conspirator B was not employed by Company A.

**Conspiracy to Commit Wire Fraud**

11. Beginning as early as in or about July 2012, through in or about September 2012, in the District of Columbia and elsewhere, Defendant Redman, Co-Conspirator A, and Co-Conspirator B, unlawfully, willfully, and knowingly conspired with one another to commit an offense against the United States, that is to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing they were false and fraudulent when made, for the purpose of executing such scheme and artifice and attempting so to do, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

**Goals of the Conspiracy**

12. The goals of the conspiracy were, among others:

for Co-Conspirator B to fraudulently obtain a mortgage by having Defendant Redman, Co-Conspirator A, and Co-Conspirator B falsely represent to the mortgage company that Co-Conspirator B worked for Company A.

**Manner and Means of the Conspiracy**

13. The manner and means used to the accomplish the goals of the conspiracy included, among others, the following:

a. Defendant Redman solicited Co-Conspirator A to falsely represent to the mortgage company that Co-Conspirator B was working for Company A.

b. Co-Conspirator A agreed to help Defendant Redman by fraudulently representing to the

mortgage company that Co-Conspirator B worked for Company A.

c. Defendant Redman, Co-Conspirator A, and Co-Conspirator B knowingly made numerous false representations to the mortgage company that Co-Conspirator B worked for Company A.

d. Defendant Redman wrote a check payable to Company A so that Co-Conspirator A could use the funds to issue a Company A check payable to Co-Conspirator B to make it appear that Co-Conspirator B was a Company A employee.

e. Co-Conspirator A signed an employment verification form falsely certifying that Co-Conspirator B worked for Company A.

f. Defendant Redman created phony Company A paystubs for Co-Conspirator B to make it appear that Company A was employing Co-Conspirator B.

**Overt Acts**

14. In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the conspirators committed and caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

a. On July 18, 2012, Defendant Redman sent an e-mail from his government account to Co-Conspirator A with the subject line "NEED TO TALK ASAP." Defendant Redman wrote, "Without going into detail in an email I NEED HELP – Call me ASAP please." Defendant Redman sent the email because he wanted Co-Conspirator A's assistance in fraudulently representing to the mortgage company that Co-Conspirator B was working for Company A.

b. On July 19, 2012, Defendant Redman sent an email to Co-Conspirator A with the subject line "THANK YOU!" Defendant Redman wrote,

> First I want to say thank you for helping [Co-Conspirator B] out in this situation . .
>
> I'm sending you a chack [sic] today so you can send [Co-Conspirator B] a [Company A] Check along with a pay stub to accompany the check. I'll make out the pay stub today and send it via email as an attachment to you [sic] be sure to mail the check like Monday so we have the check for deposit Thursday Morning along with the paystub.
>
> They may contact you today to verify [Co-Conspirator B's] employment with you - might also ask for a verification email or something. We really apprciate [sic] this [Co-Conspirator A] . . . and I will make it up to you somehow.

c. On July 20, 2012, Defendant Redman wrote a $458 check from his personal account payable to Company A. The memo line referenced "[Co-Conspirator B] Pay." Defendant Redman provided the check to Co-Conspirator A who deposited the check into Company A's bank account.

d. On July 23, 2012, Defendant Redman sent an email to Co-Conspirator A advising that Defendant Redman would be sending Co-Conspirator A a Company A pay stub in the name of Co-Conspirator B. Defendant Redman asked if he could meet with Co-Conspirator A to get a Company A paycheck payable to Co-Conspirator B for Co-Conspirator B to deposit.

e. On July 24, 2012, the loan originator emailed Defendant Redman and Co-Conspirator B. He asked if Co-Conspirator B's new employer had received the mortgage company's written verification of employment. On July 25, 2012, Defendant Redman responded with the following email falsely representing that Co-Conspirator B was working for Company A:

> I know [Co-Conspirator B] will be getting [Co-Conspirator B's] first paycheck tomorrow along with [Co-Conspirator B's] paystub . . .
>
> What do you need from [Company A]? [Co-Conspirator B] is busy at work during the day and only receives or makes calls during lunch which seems to vary from day to day. [Co-Conspirator B is] actually enjoying the work some kind of DVD duplicating/authoring.

f. On July 25, 2012, Co-Conspirator A attached an employment verification form for Co-Conspirator B to an email sent to the mortgage company. In the email, Co-Conspirator A falsely stated that Co-Conspirator B worked "in our office 95% of the time" and "is working out just fine."

g. The verification form falsely represented, among other things, that (a) Co-Conspirator B had begun working for Company A on July 18, 2012; (b) the probability of Co-Conspirator B's continued employment was "Definite;" and (c) Co-Conspirator B had grossed $480 in pay through July 24, 2012. The verification form contained a warning that "Federal statutes provide severe penalties for any fraud [or] intentional misrepresentation." Co-Conspirator A signed the form immediately below the warning.

h. On July 25, 2012, Co-Conspirator A sent an email to Defendant Redman advising Defendant Redman that Co-Conspirator A had completed the verification form for Co-Conspirator B.

i. On July 26, 2012, Defendant Redman faxed documents from a GAO fax located in the District of Columbia to the mortgage company in Virginia. The fax included a copy of a $412.78 check from Company A payable to Co-conspirator B. The check was signed by Co-Conspirator A. The memo line referenced "7/18 – 7/24/12 payroll." Defendant Redman also faxed to the mortgage company a fraudulent Company A pay stub for Co-Conspirator B. Defendant Redman created the paystub to make it appear that Co-Conspirator B was actually working for Company A.

j. On August 2, 2012, Defendant Redman emailed a second forged Company A paystub for Co-Conspirator B to Co-Conspirator A. In the email, Defendant Redman explained that the mortgage company wanted paystubs covering 30 days "so here's the next one - no need for a check

they don't require any copy of a check just deposits in the bank so I will cover it from here. This is for you in case they ask for it from you."

k. Later that same day, Defendant Redman sent the second forged paystub to the mortgage company as an attachment to an email.

l. On August 3, 2012, a letter signed in the name of Co-Conspirator B was faxed to the mortgage company. The letter attempted to explain why Co-Conspirator B had taken the job with Company A despite the approximately 87-mile distance between Co-Conspirator B's residence and Company A. It fraudulently represented that Co-Conspirator B would be making $15 per hour for Company A in September 2012.

m. On August 20, 2012, Defendant Redman sent an email to Co-Conspirator A with the subject line "almost there." Defendant Redman informed Co-Conspirator A that "We're getting closer to a solution for [Co-Conspirator B] – [Co-Conspirator B is] still working for you so if you get a call from [a bank] play the game please. If we can get to closing this week we're going to dinner."

n. On September 4, 2012, Defendant Redman wrote an email to Co-Conspirator A informing him that "[Co-Conspirator B] wants to try to finance the house so can [Co-Conspirator B] keep working for you for a few more weeks."

o. On September 17, 2012, Defendant Redman sent an email to Co-Conspirator A advising Co-Conspirator A that "[Co-Conspirator B] is still working for you [sic] will explain when I see you the 18th."

**(Conspiracy to Commit Offense Against the United States, in Violation of Title 18, United States Code, Section 371)**

CHANNING D. PHILLIPS
United States Attorney
for the District of Columbia

By: ______________________
KENDRA BRIGGS
D.C. Bar No. 978769
ANTHONY SALER
D.C. Bar No. 448254
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
202.252.6971 (Saler)
Anthony.Saler@usdoj.gov